**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIAN ANDREKOVICH, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1041 |
| | ) | |
| BOROUGH OF PUNXSUTAWNEY, | ) | Magistrate Judge Robert C. Mitchell |
| RICHARD ALEXANDER *in his* | ) | |
| *individual capacity*, and FRANK | ) | |
| WITTENBURG *in his individual capacity* | ) | |
| Defendants. | ) | |

## OPINION

Presently pending before the Court is a motion for summary judgment (ECF No. 39), with brief in support (ECF No. 41), filed by the Borough of Punxsutawney, Richard Alexander (Alexander), and Frank Wittenburg (Wittenburg), collectively, "Defendants". Plaintiff Brian Andrekovich (Andrekovich) has filed a brief in opposition (ECF No. 39). Defendants have filed a reply brief (ECF No. 44) and Andrekovich has filed a sur-reply brief (ECF No. 48). For the reasons that follow, the Court will grant Defendants' motion.

### Procedural History

Andrekovich filed his original complaint on August 9, 2017 (ECF No. 1). On October 10, 2017, Defendants filed a motion to dismiss the complaint in its entirety (ECF No. 13), and a brief in support thereof (ECF No. 17). In response, Andrekovich filed his first amended complaint (ECF No. 21), alleging that that the actions of the Borough, by and through Alexander and Wittenburg, violated the Rehabilitation Act, 29 U.S.C. §§ 791-794 (Amended Complaint Count I). Additionally, Andrekovich raised claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*, against all three Defendants arguing, respectively, that Alexander violated his rights under

the Fourth and Fourteenth Amendments (Amended Complaint Count II), that Wittenburg violated his rights under the First and Fourteenth Amendments (Amended Complaint Count III), and that the conduct of Alexander, as a statutory final policy maker, imputes onto the Borough section 1983 liability (Amended Complaint Count III).

By Memorandum Opinion and Order dated January 30, 2018, this Court denied the Defendants' motion to dismiss (ECF No. 35). On March 17, 2018, Defendants filed an answer to the amended complaint (ECF No. 36). Presently before the Court is a motion for summary judgment filed by Defendants (ECF No. 39). The motion has been fully briefed and is ripe for disposition. This Court has jurisdiction under 28 U.S.C. § 1331.

**Factual History**[1]

Background

Andrekovich is a 25-year veteran of the Punxsutawney Police Department (the Department). Andrekovich is one of eight Punxsutawney police officers and, at all times relevant to this action, he has served as the Department's sole detective, tasked with investigating all crimes against children.

Defendant Wittenburg is also employed as a police officer with the Department. All of the officers in the Department are members of the International Brotherhood Teamsters Local Union No. 110, and are subject to a collective bargaining agreement (CBA) with the Defendant Borough. At all times relevant to this action, Defendant Wittenburg served as the Department's union steward.

---

[1] The facts outlined herein are gleaned from Defendants' Concise Statement of Material Facts (ECF No. 40), Andrekovich's response and counterstatement of facts (ECF No. 42), and Defendants' reply (ECF No. 45), as well as the various exhibits attached thereto.

From early 2013 to March of 2015, when the Department was without a chief, Andrekovich acted as Officer in Charge (OIC). Andrekovich's term as OIC ended in March of 2015 when James Borza (Borza) was hired as Chief of Police. Borza served as Chief from March 2015 through February 26, 2016. Borza frequently appointed Andrekovich to OIC while Borza was on vacation.

Defendant Alexander is the mayor of Punxsutawney Borough. Pursuant to Borough Code, Alexander serves as the head of the Department and is therefore solely responsible for setting policy for the police department. However, the Borough Council has the authority to hire and fire police officers, and to approve suspensions in excess of ten days.

The December 2015 Letters

On December 7, 2015, Wittenburg sent a letter to Borza entitled "re: Conflict between Det. Andrekovich and myself," detailing a contentious 13-minute-long telephone conversation that occurred between the two men on November 12, 2015 (ECF No. 40-7). Wittenburg closed the letter by notifying Chief Borza that he has "decided to not have any more contact" with Andrekovich, stating that Andrekovich's actions have created "a hostile working environment" (Id.)

On or about December 21, 2015, a second letter, which was dated December 9, 2015 and entitled "re: Detective Brian Andrekovich," was sent to Borza from "Patrol Staff" (ECF Nos. 40-8, 40-10).[2] The letter was drafted by Wittenburg, and outlined the signatories' "concerns" about

_____

[2] The six officers who signed the letter, including Wittenburg, were referred to by various persons in the Borough as "the Gang of Six." This term is used throughout Andrekovich's filings. Accordingly, for clarity, the December 9, 2015 letter may be referred to as the "Gang of Six Letter."

3

Andrekovich's "mental status," and requested he "be afforded some assistance" (Id.)  The letter specifically referenced the following:

1. A "heated exchange" between Andrekovich and Patrolman Patrick Renwick (Renwick) regarding Andrekovich's belief that he should have been appointed to the contract negotiation committee;

2. An instance where Andrekovich "clinched [(*sic*)] his fist, and reared back as if he was going to strike Patrolman [First Class Ryan] Miller [(Miller)];"

3. An allegation that Andrekovich, upset that Miller was not required to work midnight shifts, publically blamed Miller's "cunt wife" for his schedule;

4. An incident where Andrekovich made a complaint to Borza regarding overtime worked by Patrolman First Class Jeffrey R. Winfield (Winfield).  In response, Borza enacted the Overtime Equalization Policy, which Andrekovich took as a personal affront, resulting with a confrontation with Wittenburg where Andrekovich claimed Wittenburg was "fucking him" with this policy and that the policy would be "gone with Borza;"

5. An occasion where Andrekovich verbally abused Winfield causing the latter to "physically breakdown [(*sic*)];"

6. Several instances of Andrekovich verbally abusing Patrolman First Class Heath Zeitler (Zeitler), to the point where Andrekovich was specifically asked not to attend the funeral of Zeitler's grandmother.  Andrekovich ignored this warning and a "large confrontation" occurred at the funeral home between Andrekovich and Zeitler's wife;

7. An allegation that Andrekovich played for persons present in the squad room sexually explicit videos of a 15-year-old sexual assault victim, telling the officers to "check this out."  When Wittenburg told Andrekovich that "he has got problems" and pointed out that "she is someone's daughter[,] not to mention a child," Andrekovich allegedly replied "this girl is going to make one hell of a stripper."  Wittenburg left the squad room telling Andrekovich that he is "fucked in the head."

(Id.)

The January 2016 Letters

On January 5, 2016, Borza submitted to Alexander a letter requesting the mayor order Andrekovich to speak with a mental health professional (ECF No. 40-9).  Borza explained that he had received a letter "signed by [six] of the [eight] full-time officers who put into writing that they

4

do not feel safe … with … Andrekovich … due to his unpredictable and irrational behaviors" (Id.) Borza's letter also relates an incident alleged to have occurred on January 5, 2016, where Andrekovich became "VERY hostile and antagonistic" after being questioned by Borza about taking another officer off of a court schedule without permission (Id.)(emphasis in original). In his January 5 letter, Borza describes Andrekovich as "a ticking bomb" (Id.)

That same day, Andrekovich submitted a letter to Alexander entitled "Targeting Hostile Work environment, harassment in the work place, threatening behavior by … Borza" (ECF No. 40-11). This letter confirms the January 5, 2016 incident between Borza and Andrekovich, although Andrekovich denies raising his voice and instead describes Borza as "upset" and "verbally loud" (Id.) According to the letter, Borza accused Andrekovich of "going behind his back and causing problems" and characterized as "disrespectful" Andrekovich telling him to "have a nice day" before he left Borza's office (Id.) Andrekovich stated that he felt "very threatened by [Borza's] attitude and demeanor" and removed himself from the situation as soon as possible (Id.)

Andrekovich contacted Alexander regarding the incident and was advised to put his statement in writing, per Alexander's policy with respect to Department disputes (Id.) Andrekovich did so and insisted that Patrolman First Class Kirk Brudnock (Brudnock) be present while Andrekovich was typing the letter to Alexander (Id.) Notably, Andrekovich wrote that he explained to Brudnock that he "didn't trust" Borza and believed him to be a "hot head" who "goes out of control when you don't agree with him or go against him" and expressed his fear that Borza would assault him (Id.) Andrekovich acknowledged that he described Borza as "nuts" and a "lunatic" during this conversation (Id.)

On January 5, 2016, Chief Clerk Jan Bozak (Bozak) was instructed by Andrekovich to prepare a written statement with respect to her observations regarding the interaction between

Andrekovich and Borza that morning (ECF No. 40-12, pg. 11).  Andrekovich indicated that this request came from Alexander ("the mayor told me you are to write a statement"); however, Bozak did not reduce her observations to writing until instructed to by Borza (Id.)  In her statement, Bozak described both men as "talking," but stated that Andrekovich had "slammed" the door to Borza's office toward the end of the discussion (Id.)  Later on January 5, 2016, Bozak wrote a second statement, this time detailing her interaction with Andrekovich after he relayed Alexander's "request" for the earlier statement.  According to Bozak, at the end of the work day, Andrekovich approached her and told her the mayor wanted to see her before she left for the day (Id.)  When she went to his office, Alexander said that Andrekovich had told him Bozak had wanted to initiate the meeting (Id).  Bozak commented to Alexander and others in the room, including a member of Borough Council, that "this bullshit needs to stop" (Id.)

On January 20, 2016, Zeitler submitted to Borza a letter raising a complaint of hostile work environment against Andrekovich (ECF No. 40-13).  In this letter, Zeitler listed various derogatory names Andrekovich has called him since Zeitler started with the Department in 1998 (Id.)  He then related that, although he is afraid of Andrekovich and had spoken to previous chiefs about the situation in the past, he had never reduced his complaint to writing for fear of retaliation (Id.)  Zeitler then described an incident, referenced in the Gang of Six Letter, where Andrekovich became aggressive and mean when Zeitler took time off for his grandmother's funeral and then showed up at the funeral home, despite being told by other officers not to attend (Id.)  Zeitler noted that, after the funeral, Andrekovich "attempted to bring [Zeitler] up on insubordination charges and leaking information from the Department because [he] told his family what [Andrekovich] said" (Id.)  An open meeting was held in May of 2015 concerning human resources issues within the Department, at which time Zeitler asked Andrekovich to leave him alone (Id.)  Zeitler and

Andrekovich no longer speak to one another, and when they do, Zeitler records such interactions in a note book (Id.)

Zeitler closed his letter by asking Borza to investigate Andrekovich's response to the Gang of Six Letter (Id.)  Zeitler believed that the contents and signatories of the letter were supposed to remain confidential; however, on December 19, 2015, Andrekovich told another officer that he knew what was written in the letter and which officers had signed it, and informed the other officer that "it's on" (Id.)  Zeitler expressed his feelings of unease and betrayal and reiterated to Borza that he expected Andrekovich to retaliate "100 fold" (Id.)

The allegations contained in the Gang of Six Letter, Andrekovich's hostile work environment complaint, and Zeitler's hostile work environment complaint were referred to and investigated by special counsel to the Borough, Attorney Aimee Willett (Willett) (ECF Nos. 40-10; 40-11; 40-12; 40-14).

Willett's Investigations

On January 21 and 22, February 4, and March 10, 2016, Willett conducted interviews with the persons involved in the myriad accusations outlined above, including Andrekovich (ECF No. 40-14).  On or about March 11, 2016, Willett issued a report of her investigation into the hostile work environment complaint made by Andrekovich (ECF No. 40-12).   Following the interviews and her review of numerous documents, including the two written statements made by Bozak, and 85 emails sent by Borza to all officers in the Department between April 1, 2015 and January 20, 2016, Willett concluded that Andrekovich's hostile work environment complaint was unsubstantiated (Id.)  Specifically, Willett found that "the January 5, 2016 encounter between []

Andrekovich and [] Borza was a legitimate line of inquiry" and the conduct did not meet the definition of harassment set forth in the Department's personnel manual (Id.)

On or about March 17, 2016, Willett issued a report with respect to the allegations contained in the Gang of Six Letter and Zeitler's hostile work environment complaint (ECF No. 40-14). As a result of her investigation, Willett recommended that Andrekovich be sent for a fitness for duty (FFD) evaluation (Id.) Willett made this recommendation based on the following:

1. Information gleaned during an unsolicited, unplanned interview with dispatcher Cheryl Musselman, who sought out Willett to report her concerns about Andrekovich's recent behavior;

2. Andrekovich's "agitated" and "confrontational" demeanor at a meeting held in Kittanning, PA on February 4, 2016, between Andrekovich, his attorney, Alexander, Borough Manager Ben White, Borough Council President Jamie Sherry, and Willett, which ultimately concluded when Andrekovich stormed out "mid-conversation" (emphasis in original);

3. The observations of Bozak regarding the January 5, 2016 confrontation between Borza and Andrekovich;

4. The letter from Borza to Alexander regarding the January 5, 2016 confrontation between Borza and Andrekovich;

5. Individual interviews with the officers who signed the Gang of Six Letter, including reports that the officers were refusing to enter the Department to avoid interacting with Andrekovich and had taken to wearing their bulletproof vests when in the office due to his "unstable behavior;"

6. Reports from Alexander regarding Andrekovich's repeated requests that Borza be suspended and his oft-stated belief that Alexander was "brainwashed" by Borza and was suffering from other health issues;

7. Allegations from Borough and Department employees regarding Andrekovich's "counter–productive behavior," "irritability," and "heightened levels of suspiciousness;"

8. Assertions by Andrekovich's attorney that he was under a large amount of stress and "willing to participate in counseling."

(Id.)

Based on Willett's recommendation, Alexander contacted Dr. Anthony Goreczny and asked him to evaluate Andrekovich (ECF No. 40-4, pg. 39).

FFD Examination and Paid Administrative Leave

At a meeting held on April 7, 2016, Alexander ordered Andrekovich to undergo an FFD examination by Dr. Goreczny and informed Andrekovich that he would be placed on paid administrative leave pending the results (ECF No. 40-15). Alexander stated that the evaluation was being scheduled "due to various recent concerns" about Andrekovich's behavior (Id.)

Andrekovich submitted to the examination and was cleared for duty by letter from the evaluating doctor on April 15, 2016 (ECF No. 42-8). However, in Dr. Goreczny's opinion, Andrekovich had "some distress" and would benefit from treatment, specifically "focused on learning how to manage his emotions and how to appropriately address conflict with others" (Id.) Thus, he recommended that Andrekovich be permitted to return to work following his "initial psychotherapy treatment sessions" and suggested the name of a psychologist who regularly works with law enforcement (Id.)

Despite this recommendation, on April 19, 2016, the Mayor informed Andrekovich that he must undergo additional counseling and further evaluation before returning to work (ECF No. 28-1). That same day, Andrekovich's attorney sent a letter to Alexander and Willett requesting a copy of Dr. Goreczny's report and giving notice that Andrekovich would report for his morning shift on April 20 (ECF No. 28-3). Ultimately, the union became involved, and following the submission of a letter recommending that Andrekovich be returned to active duty, Andrekovich resumed active status as a detective on or about April 27, 2016 (ECF No. 28-2).

<u>Andrekovich's Return to Work</u>

Following Andrekovich's return to active duty, he did not seek further counseling or treatment as advised (ECF No. 40-3, pg. 126). While he had received his normal pay throughout his administrative leave, it was his belief that, under the union contract, he was entitled to overtime pay (ECF No. 42, ¶ 42). His union grievance to recover the same was ultimately refused by Alexander, and the issue was escalated to the grievance committee (ECF No. 40-3, pg. 140). At a hearing on the grievance, Alexander provided the committee, including Wittenburg, with a copy of Dr. Goreczny's letter (<u>Id</u>.) One borough council member, Larry Chenoga, commented that he had already seen the letter prior to the grievance committee hearing (<u>Id</u>. at pg. 142).

Andrekovich contends that, after he resumed working, the Gang of Six and other Borough employees continued the campaign to oust him from the Department that had begun after Borza was appointed to serve as Chief. In May of 2016, Officers Zeitler, Miller, Brudnock, and Wittenburg shared with a State Representative the Gang of Six letter (ECF No. 42, ¶ 102). The letter was shared with other members of the public and discussed "around town" (<u>Id</u>. at ¶¶ 121, 154). On this point, Andrekovich strenuously denies the actions and statements attributed to him in these letters, particularly the allegation of a heated exchange between himself and Officer Renwick, which he contends is contradicted by Wittenburg's contemporaneous report of the event, and the incident where he was alleged to have threatened to punch Miller, which Andrekovich alleges did not occur (ECF No. 42, ¶¶ 75-79). He further contends that the allegations contained in the Gang of Six Letter regarding an underage girl involved an "arrestee" not a victim, and although he admits to looking at explicit content on his computer as part of an investigation, he denies asking officers to look at his computer (Id. at ¶¶ 88-89). Andrekovich alleges that

Alexander took no action with respect to the actions of the other officers and their comments about his mental status.

**Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that:

[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For the purposes of summary judgment, "[a] material fact is '[a] fact[ ] that might affect the outcome of the suit under the governing law.'" Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." (Id.) (quoting Anderson, 477 U.S. at 248-49).

In resolving a motion for summary judgment, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts

in that party's favor. <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 266 (3d Cir. 2005); <u>Doe v. County of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

**Scope of Review**

To the extent that Andrekovich attempts to limit the scope of this Court's review to exclude the documents drafted by Willett on the basis that they contain "multilevel hearsay statements," this Court is mindful that, in this Circuit, "hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." <u>Smith v. City of Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009). Certain portions of Willett's reports, specifically comments made by Ms. Musselman and Ms. Bozak, as well as comments attributed to unknown persons, constitute hearsay (ECF No. 40-14). However, acknowledging that exceptions to the hearsay rule may be applicable here, for example, application of Rule 803(5) with respect to Bozak's contemporaneous report of the incident between Borza and Andrekovich, this Court will limit its consideration only to evidence which would conceivably be admissible at trial.

**Discussion**

1. <u>Andrekovich's Claims of Discrimination Under the Rehabilitation Act</u>

The Rehabilitation Act, provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). The Third Circuit has explained that "[w]hether suit is filed under the Rehabilitation Act or under the [Americans

with] Disabilities Act, the substantive standards for determining liability are the same." <u>McDonald</u>

<u>v. Commonwealth of Pennsylvania</u>, 62 F.3d 92, 95 (3d Cir. 1995); 29 U.S.C. § 794(d).

Accordingly, the familiar framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792, 793-94 (1973), is applicable.

> Under the <u>McDonnell Douglas</u> burden shifting paradigm, plaintiff has the initial burden to make a *prima facie* showing of discrimination, but if s/he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. If the defendant meets this burden, the presumption of discriminatory action raised by the *prima facie* case is rebutted. However, the plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual. In order to prove the employer's explanation is pretextual, the plaintiff must cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. A plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either (i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

<u>Wishkin v. Potter</u>, 476 F.3d 180, 184–85 (3d Cir. 2007) (citations and quotation marks omitted).

To state a *prima facie* case under the Rehabilitation Act, Andrekovich must establish the

following:

1. he has a disability;

2. he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and

3. he nonetheless suffered an adverse employment action as a result of discrimination.

<u>See</u> <u>Donahue v. Consol. Rail Corp.</u>, 224 F.3d 226, 229 (3d Cir. 2000); <u>Shiring v. Runyon</u>, 90 F.3d

827, 831 (3d Cir. 1996).

The parties only dispute the third prong of the above test.[3] In his amended complaint, Andrekovich alleges two adverse employment actions, both of which Defendants argue are legally insufficient to support a *prima facie* case:

1. the requirement that Andrekovich submit to a fitness for duty examination;

2. the paid administrative leave on which he was placed while that examination was pending.

(ECF No. 21, ¶¶ 65-66).[4]

---

[3] The issue of whether Andrekovich qualifies as an individual with a disability, or one who is regarded by his employer as having a disability, is seemingly conceded by the Defendants. Indeed, based on the allegations contained in the amended complaint, this Court denied Defendants' motion to dismiss on the basis that, at that juncture, Andrekovich had satisfied the Court that he was a qualified individual with a disability. However, in his brief in opposition to the motion for summary judgment, Andrekovich states that the "fact of the matter is that nobody sincerely believed that [he] was psychologically unfit for duty, but he was required to undergo the examination and suspension solely to pacify the complaining officers 'concerns'" (ECF No. 43, pg. 12-13 (unnumbered)). This admission flies in the face of Andrekovich's assertion of a *prima facie* case for discrimination. See 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity"); see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)(To state a *prima facie* case for "regarded as" discrimination, a plaintiff must prove that an employer "entertain[ed] misperceptions about the individual—it must believe either that [the employee] has a substantially limiting impairment that [he] does not have or that [he] has a substantially limiting impairment when, in fact, the impairment is not so limiting."). Combined with the result of his FFD evaluation – that Andrekovich was not suffering from any mental illness or disorder and was fit for duty – even if Andrekovich were able to make a viable claim that he suffered an adverse employment action, his *prima facie* case would fail.

[4] In his complaint, Andrekovich also lists (1) damage to his professional and personal reputation; (2) the "hostile work environment" created by others in the Department, specifically Defendant Wittenburg, and; (3) the disclosure of Dr. Goreczny's letter to other Borough officials as "adverse employment actions" (ECF No. 21, ¶¶ 65-66). However, he appears to abandon these claims in his response to the motion for summary judgment. Regardless, this Court finds persuasive case law from other jurisdictions which conclude that harm to one's personal or professional reputation is not an "adverse employment action." See Holcomb v. Powell, 433 F.3d 889, 902 (D.C.Cir. 2006) (holding that "purely subjective injuries, such as dissatisfaction with a reassignment, public

a.      <u>Whether an FFD Examination Constitutes an Adverse Employment Action</u>

Pursuant to the ADA, an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, **unless such examination or inquiry is shown to be job-related and consistent with business necessity**." 42 U.S.C. § 12112(d)(4)(A) (emphasis added); <u>see</u> <u>also</u> C.F.R. 1630.14(c).  As the Third Circuit has recognized, "business necessities may include ensuring that the workplace is safe and secure." <u>Ward v. Merck & Co</u>., 226 F. App'x 131, 140 (3d Cir. 2007) (citing <u>Conroy v. New York State Dept. of Correctional Services</u>, 333 F.3d 88, 98 (2d Cir. 2003)).  The burden falls on the employer to demonstrate that the examination genuinely serves the asserted business necessity and that the request is no broader nor more intrusive than necessary. (<u>Id</u>.)

Defendants argue that the FFD examination was consistent with business necessity as it was "based on the recommendation of outside counsel following substantial investigation" which revealed evidence that "numerous co-workers" were concerned about Andrekovich's "aggressive," "threatening," and "paranoid conduct" and believed that Andrekovich was a danger to himself and others (ECF No. 41, pg. 15).  Andrekovich urges this Court to find unavailing Defendants' argument because the Gang of Six Letter "make[s] no mention whatsoever of any violent behavior, or even any threat of physical violence." (ECF No. 43, pg. 6 (unnumbered)).  While Andrekovich acknowledges the existence of other concerns, such as Patrolman Winfield's

humiliation, or loss of reputation," however, "are not adverse actions.").  Andrekovich's hostile work environment claim will be discussed in greater detail *infra*.

deposition testimony that he overheard other members of the Gang of Six make comments "that they were afraid to go on calls with him," he emphasizes that "none of these ever offered any specific basis for the comments." (Id. at pg. 7 (unnumbered)).  Additionally, he points out that, in May of 2015, when given the opportunity to air grievances within the Department, "nobody said anything about [him] at all." (Id.)  Finally, in an attempt to demonstrate that a genuine issue exists with respect to the business necessity of the examination, Andrekovich directs this Court's attention to commendations from Alexander for exemplary service as OIC. (Id.)

However, as outlined above, ample evidence was presented that was sufficient to justify the FFD examination.  This is true regardless of Dr. Goreczny's conclusion that Andrekovich was fit for duty and not suffering from any impairment that would prevent him from fulfilling the duties of his job.  See Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000) (finding no ADA violation and holding that it was "entirely reasonable and even responsible" for the police department to require the officer to undergo an FFD evaluation upon learning that he was experiencing difficulties with his mental health).  Moreover, contrary to Andrekovich's argument, the facts cited by Andrekovich do not create a genuine issue of material fact.  The Gang of Six Letter outlines allegations of violent, abusive behavior which more than justify the business necessity of the evaluation. Accordingly, because referral of a police officer for psychiatric testing falls within the confines of a legitimate job-related inquiry and, in this case, was an appropriate response to the concerns raised about Andrekovich's ability to perform the job of detective, this Court finds that the evaluation was not an adverse employment action (ECF No. 41, pg. 8-9).

      b.      <u>Whether Involuntary Paid Administrative Leave Constitutes an Adverse Employment Action</u>

The Third Circuit has described an adverse employment action "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Jones v. Se. Pa. Transp. Auth.</u>, 796 F.3d 323, 326 (3d Cir. 2015) (citations omitted).  In <u>Jones</u>, the Court affirmed the District Court's determination that Jones' "suspension with pay did not constitute an adverse employment action under Title VII," noting that "other courts of appeals have unanimously concluded that placing an employee on paid administrative leave where there is no presumption of termination is not an adverse employment action." (<u>Id.</u>) (collecting cases).

Andrekovich argues that <u>Jones</u> is inapplicable here because this is not a Title VII action and the Equal Employment Opportunity Commission has not "promulgated a regulation applicable to Title VII such as that which applies to the ADA and prohibits placement on involuntary leave" (ECF No. 43, pg. 5 (unnumbered)). However, as the Third Circuit has held

> In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Indeed, we routinely use Title VII and ADEA case  law interchangeably, when there is no material difference in the question being addressed. <u>DiBiase v. SmithKline Beecham Corp.</u>, 48 F.3d 719, 724 n. 5 (3d Cir. 1995). And, the provisions of the ADA itself recognize the parallel nature of the statutes, as they provide that

>> [t]he powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

> 42 U.S.C. § 12117(a).

<u>Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.</u>, 60 F.3d 153, 156–57 (3d Cir. 1995).

Further, the Third Circuit has stated that a district court may properly consider Title VII case law

for guidance in cases arising out of the Rehabilitation Act: "[a]s the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized." (Id. at 157) (citing 29 U.S.C. §§ 791(g), 793(d), 794(d); 42 U.S.C. § 12117(b)). Thus, this Court is unconvinced that Jones is inapplicable here.

Andrekovich characterizes his leave as a "paid suspension." However, important for this Court's analysis, there was no "presumption of termination" by the Borough at any point, see e.g. (ECF No 40-4, pg. 157), and he returned to the position of detective. Andrekovich also argues that, because he had to file a grievance to recover overtime pay to which he was entitled during his paid administrative leave, the leave itself constitutes an adverse employment action. This Court is aware of no case law that would support this contention, nor does Andrekovich cite to any case on point. Regardless, because he was able to recover the lost overtime through the administrative procedure in place for contractual grievances, the paid administrative leave itself was not "serious and tangible enough to alter … [the] compensation, terms, conditions, or privileges of" his employment. As such, his paid administrative leave does not constitute an adverse employment action.

> c.    Whether Dissemination of Dr. Goreczny's Report to Borough Council is an Adverse Employment Action

Andrekovich alleges that Alexander violated the Rehabilitation act by disclosing to Borough Council his "confidential psychological information … without legal justification or … consent" (ECF No. 21 ¶ 65(d)).

> [I]t is well-established that "[m]edical information may be given to—and used by—appropriate decision-makers involved in the hiring [or promotion] process so they can make employment decisions consistent with the ADA."

Enforcement Guidance: Preemployment Disability–Related Questions and Medical Examinations (EEOC Oct. 10, 1995), reprinted in EEOC Compl. Man. (CCH) ¶ 6903, at 5380; see also 42 U.S.C.[] § 12112(d)(3)(B) (contemplating that employers will obtain "information ... regarding the medical condition or history of the applicant ...").

Henderson v. Borough of Baldwin, 2017 WL 6371361, at *4 (W.D. Pa. Dec. 13, 2017).

There is no dispute that the Pennsylvania Borough Code vests in borough councils the power to make hiring and firing decisions with respect to a borough police force. See 8 Pa.C.S. § 1121(a). Additionally, the Code provides that physical and psychological examinations are properly administered as a condition of employment as an officer, and contemplates dissemination of the results of those tests to council for the purposes of determining whether an individual is qualified to serve. See 8 Pa.C.S. § 1189. Accordingly, due to the level of oversight vested in Council by the Borough Code with respect to hiring and retaining qualified police officers, the Court cannot agree that dissemination of Dr. Goreczny's report was done in violation of the ADA. See Henderson, supra.

Because Andrekovich has failed to establish a *prima facie* case of discrimination under the Rehabilitation Act, see Donahue, 224 F.3d at 229, this Court need not engage in further analysis under McDonnell Douglas. Nonetheless, consistent with the above analysis, this Court finds that Defendants have offered a legitimate non-discriminatory reason for seeking an FFD: pervasive complaints about Andrekovich's increasingly hostile, aggressive, inappropriate, and paranoid behavior in the months leading up to the Gang of Six Letter and subsequent investigation. Although he disputes the accusations in the Letter, in order discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759,

765 (3d Cir. 1994) (citations omitted). The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [anti-discrimination statutes do] not interfere." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Thus, even if certain of the allegations contained in the Gang of Six Letter were deemed unfounded, such facts would not demonstrate that the Borough acted out of discriminatory animus in ordering the FFD evaluation.

2. Andrekovich's Hostile Work Environment Claim

Andrekovich alleges that the Borough violated the Rehabilitation Act by "subjecting him to a hostile and abusive working environment based on their professed belief that he suffered from a mental impairment and/or psychosis" (ECF No. 21, ¶ 65). As Defendants point out, the Third Circuit has not recognized a cause of action for hostile work environment under the ADA. See Barclay v. Amtrak, 240 F. App'x 505, 508 (3d Cir. 2007) (citing Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir.1999)). Assuming a cause of action does exist, stating a *prima facie* case would require Andrekovich to prove that (1) he is a qualified individual with a disability under the ADA; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment; and (5) that the Borough knew or should have known of the harassment and failed to take prompt effective remedial action. Walton, 168 F.3d at 667.

At the outset, the Court notes that ADA does not protect an employee from every kind of harassment, only harassment that is based upon the employee's disability. See Walton, 168 F.3d

at 667. Andrekovich admits that no one in the Department "sincerely believed" he was mentally ill (ECF No. 43, pg. 12-13 (unnumbered)). Because he admits that any alleged harassment is unrelated to a perceived disability, his claim must fail.

However, even if Andrekovich's allegations satisfied the first portion of the test outlined in Walton, the Court notes that

> to prove an "abusive work environment" under [the ADA], the environment must be shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment. [Andrekovich] would not need to prove that []he suffered injury or that [his] psychological well-being was seriously affected. [He] would, however, be called upon to show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."

Walton, 168 F.3d at 667 (citations omitted).

Andrekovich's allegations of a hostile work environment consist of "verbal abuse, false accusations of criminal conduct and neglect of duty," by his fellow officers; "unwarranted disciplinary proceedings and imposition of additional duties which interfered with his ability to do his job; attempts to discredit him with his friends, government officials, co-workers and the public in general; interference with his work equipment and materials; and ostracism by his coworkers" (ECF No. 43, pg. 14-15 (unnumbered)).

### a. Verbal abuse

The record shows three alleged incidents of verbal abuse directed toward Andrekovich. As outlined in the Gang of Six Letter, the first occurred at a meeting in 2013 regarding the contract negotiation committee appointments. At that meeting, Renwick told Andrekovich that he was a "lying, conniving, back-stabbing, shit[-]stirring, piece of shit" (ECF No. 42-13). Although certainly offensive and inappropriate, the record is devoid of evidence that this comment was somehow related to any perceived disability suffered by Andrekovich.

The Letter also outlined an incident where Wittenburg alleged that Andrekovich was showing provocative videos of a child victim or witness, in the squad room (ECF No. 40-8).  In response, Wittenburg told Andrekovich that he "had problems" and was "fucked in the head" (Id.).  Combined with the general tone of concern expressed in the letter, these comments could arguably be based on Wittenburg's belief that Andrekovich was suffering from a mental disability.

In December of 2015 and February of 2016, officers Brudnock and Wittenburg commented to Andrekovich that he could use the "pending charges" to "make a workers' compensation claim for mental disability" (ECF No. 40-3, pg. 23-26).  Although directly linked to perceptions about Andrekovich's mental health, such comments, particularly when coming from the Wittenburg in his capacity as union representative, do not appear to rise to the level of harassment under the statute.

b. <u>False accusations of criminal conduct</u>

This contention apparently refers to allegations that Andrekovich showed Alexander child pornography which were discussed by Attorney Willett during the meeting in Kittanning (ECF No. 40-3, pg. 19-20).  That allegation is not specifically contained in the Gang of Six Letter, and Andrekovich is uncertain of its source (Id.)  It is unclear, therefore, whether this allegation was somehow related to any perceived disability suffered by Andrekovich.  However, this uncertainty does not create a genuine issue of material fact as to whether Andrekovich's work environment was hostile.

c. <u>Neglect of duty</u>

Andrekovich alleges that three officers "lodged a disciplinary complaint" against Andrekovich alleging they had an "ironclad dereliction of duty charge" against him (ECF No. 43,

pg. 21 (unnumbered)). This allegation stems from a situation that occurred in March of 2016, following a complaint made by Brudnock, Miller and Zeitler wherein Brudnock refused to handle a burglary case telling the dispatcher, "Let Andrekovich take it. He's a detective" (ECF No. 40-4, pg. 113-124). Alexander investigated the charges and scheduled a hearing, but ultimately, at the advice of Willett, decided not to discipline Andrekovich for his involvement in the situation. There is no indication that this incident, investigation, or potential discipline was in any way related to Andrekovich's perceived mental defect.

The neglect of duty allegation could also be in reference to comments made by Wittenburg to former Councilman Aaron Hendricks (ECF No. 42-16). As discussed further *infra*., some of Wittenburg's comments to Hendricks are arguably related to Wittenburg's belief that Andrekovich was suffering from a mental disability or defect; however, without more it is unclear whether the mentioned "dereliction of duty charge" was based in any way on perceptions that Andrekovich was disabled.

### d. Unwarranted disciplinary proceedings

Alexander testified in his deposition that he "never" disciplined Andrekovich during his time as mayor (ECF No. 40-4, pg. 117). To the extent that Andrekovich may be referencing the March 2016 situation discussed above, the Court reiterates that there is no connection between this incident and Andrekovich's perceived mental defect.

### e. Imposition of additional duties which interfered with his ability to do his job

This includes claims of being "overloaded with cases," and being assigned to rotating call assignments (ECF No. 40-3, pg. 265). In his deposition, Alexander stated that he was receiving a

number of complaints about Andrekovich not participating in call rotations, but stated that, to his knowledge, those complaints had nothing to do with Andrekovich's perceived mental defect (ECF No. 40-4, pg. 130).

 

      f.   <u>Attempts to discredit him with his friends, government officials, co-workers and the public in general</u>

Relying on the deposition testimony and statements of Hendricks, Andrekovich alleges that, during a three-day period in February of 2016, Wittenburg, Zeitler, Miller, and Brudnock made various comments to Hendricks about Andrekovich's mental health (ECF No. 40-6, pg. 6-21). These conversations occurred at Rebuck's Garage, a local business owned by a borough councilwoman and her husband (<u>Id.</u>) Hendricks reduced these incidents to two written statements. In the first, he quoted Wittenburg as stating as follows.

> You know, your friend [Andrekovich] has fucking problems. He is nuts. You work in Mental health. Haven't you seen the man has problems? I won't even let my fucking kid drive through town as he will probably put a bullet through his head. I tell him to stay out of town. Your friend is nuts. You should get both sides of the story. Aaron, you were a cop, you know how to get both sides of the story. The fucking guy is unstable.

* * *

> I'm just saying, your friend has mental problems and needs evaluated. You as a person in the field of mental health should know that.

(ECF No. 42-16, pg. 2) (capitalization omitted). In that statement, Hendricks noted that "for Tuesday, Wednesday and Thursday, I had more officers claiming to be my friends and bashing Andrekovich the same" (<u>Id.</u>) In his deposition, Hendricks stated that Zeitler and Brudnock told him that Andrekovich "has problems" and "is nuts" (ECF No. 40-6, pg. 55-57). Due to Hendricks' involvement with the mental health system, Miller asked Hendricks to get Andrekovich "help" (<u>Id.</u> at pg. 55). Hendricks later wrote a second statement expanding upon Wittenburg's alleged

statements, noting that one female employee is "terrified" to work the same shift as Andrekovich (Id. at pg. 3). Hendricks indicated that other people were present when these statements were made (ECF No. 40-6, pg. 7-8). Hendricks' statements were given to Andrekovich (id. at pg. 20-21) and Hendricks assumed that Andrekovich had filed a complaint with Alexander, however no one from the Borough contacted him to follow up (id. at pg. 21-22).

In his deposition, Zeitler denied making the statements Hendricks attributes to him and disavowed any knowledge of other officers making comments about Andrekovich in Rebuck's Garage (ECF No. 42-7, pg. 86). Zeitler admitted that he, Wittenburg, Miller and Brudnock shared the Gang of Six Letter with a state representative because they did not feel like the Borough was assisting with their concerns (ECF No. 42-7, pg. 11). Zeitler denied that this meeting was due to concerns about Andrekovich's mental health (Id.).

Andrekovich stated in his deposition that, at some point in February of 2016, Miller told a dispatcher that Andrekovich was "a nut job" (ECF No. 40-3, pg. 47-48, 56). Around the same time both Zeitler and Wittenburg told the same dispatcher that Andrekovich was "crazy" (Id. at 49-50, 56). While he did not mention these specific instances to Alexander in his verbal report of alleged harassment, Andrekovich testified that Alexander was aware of the situation (Id.) Andrekovich also outlined: (1) an incident where Miller referred to Andrekovich as a "nut job" to another Borough employee, (2) a claim that Brudnock told a separate Borough employee that Andrekovich was "off because [he] was nuts," (3) an allegation that Miller told a dispatcher that he believed Andrekovich, if given the opportunity, would shoot Wittenburg's son (Id. at 50-56). Again, certain of these statements, particularly those by Wittenburg, have a plausible connection to Andrekovich's mental health.

g.   Interference with his work equipment and materials

At some point, the computer Andrekovich used was removed from the squad room by Wittenburg (Id. at 193). When questioned by Alexander, Wittenburg stated that he believed the squad room should be able to be made private for officers conducting interrogations (Id.) Alexander had the computer returned to its location in the squad room (Id.) Again, although this action may have impacted Andrekovich, there is no indication that it was related to his perceived mental disability.

h.  Ostracism by his coworkers

Andrekovich alleges that, after he returned to work, someone put up a cuckoo clock in the squad room and placed a "big nut" in his mailbox (ECF No. 40-3, pg. 265). Additionally, he maintains that certain officers are not speaking to him, refusing to work with him, and not inviting him to social events (Id. at 59-62). Arguably, the first two incidents could be related to the officers' belief that Andrekovich suffers a mental disability.

To establish a *prima facie* case, Andrekovich bears the burden of proving that these actions were "sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment." Walton, 168 F.3d at 667. "To judge whether such an environment is hostile or abusive, we must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citations omitted). Viewing the above in the light most favorable to Andrekovich, the claims he has pled which could be considered harassment under the ADA in support of a hostile work environment claim are: (1) comments made by Wittenburg to

Andrekovich directly as outlined in the Gang of Six Letter; (2) comments made by Wittenburg to Hendricks as detailed in Hendricks' statements; (3) comments made by other officers to various Borough employees; (4) the installation of a cuckoo clock in the squad room by unnamed individuals and; (5) the placement of a nut in Andrekovich's mailbox.

This Court is mindful that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). Moreover, the ADA is not a general code of civility, and the standards which govern claims under these statutes are designed to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, ... jokes, and occasional teasing.'" Id. (citations omitted). The record in this matter demonstrates that use of profanities, yelling, and slurs, including "nuts" and "lunatic," in reference to fellow officers, including Borza, is pervasive in the culture of the Department. Andrekovich himself admitted to participating in this conduct. See e.g. (ECF No. 40-11). In this case, the Court cannot agree that the alleged harassment was sufficiently severe or pervasive to support Andrekovich's claim of harassment under the ADA.

Moreover, the record is clear that Alexander, in his official capacity, sought to remedy those instances reported to him through investigation into the issues and verbal reprimand of the offending officers (ECF No. 40-4, pgs. 66-68, 99, 185, 188-89, 193-94). Andrekovich argues that the remedial measures were inadequate because the conduct is ongoing (ECF No. 40-3, pg. 265-66). It is well-settled that

> [t]he question before [this Court] is not whether the investigation was adequate[,] but rather whether the remedial action was adequate. Even if a company's investigation into complaints of … harassment is lacking, the employer cannot be held liable for the hostile work environment created by an employee under a

negligence theory of liability unless the remedial action taken subsequent to the investigation is also lacking. In other words, the law does not require that investigations into … harassment complaints be perfect. Rather, to determine whether the remedial action was adequate, [the Court] must consider whether the action was "reasonably calculated to prevent further harassment."

Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997) (footnotes omitted).  Importantly, "[e]ven if the remedial action does not stop the alleged harassment, it is "adequate" if it is "reasonably calculated" to end the harassment." Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) (citations and footnotes omitted).

In this case, the vagueness of the timeline with respect to the alleged offending conduct, specifically with respect to those instances alleged to have occurred after Andrekovich returned from his paid administrative leave, make it difficult to determine what was reported to Alexander. Andrekovich admits that he has "no clue" what the Alexander did with respect to these complaints (ECF No 40-3, pgs. 43, 265).  However, it is undisputed that Andrekovich brought various complaints to Alexander, in writing, and Alexander investigated those complaints promptly and issued verbal reprimands to the offenders.  He also called department-wide meetings and encouraged the airing of grievances within the Department.  This Court is convinced that such remedial measures were "reasonably calculated" to end the alleged harassment.

For all of the forgoing reasons, even when viewed in the light most favorable to Andrekovich, this Court is unconvinced that the alleged harassment escalated beyond offensive utterances, that the harassment was in any way based on a perceived disability, or that Alexander failed to take prompt remedial action when such instances were reported such that *respondeat superior* liability should attach.  While Andrekovich maintains that defending himself from Alexander's "fact-findings" into alleged incidents was "interfering with" the performance of his job duties, the record shows that the only "fact-finding" conducted that was connected to any

alleged mental disability or defect was that conducted by Willett in response to the complaints outlined in the December 2015 letters. As outlined above, this investigation was proper given the nature of the complaints and cannot qualify as harassment under the statute. Thus, the Court cannot agree that there is a genuine issue with respect to the Borough's liability under these facts.

### 3. Andrekovich's Claims Arising Under the Civil Rights Act

Section 1983 provides as follows.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). To be afforded a remedy in federal court under section 1983, Andrekovich must prove two elements. First, he must show a "violation of a right secured by the Constitution and laws of the United States." West v. Atkins, 487 U.S. 42, 48 (1988). Second, he must "show that the alleged deprivation was committed by a person acting under color of state law." (Id. at 48).

### a. Claims Against Alexander

#### 1. Alleged Violation of the Fourth Amendment

Andrekovich alleges that Alexander, in ordering the FFD evaluation, violated his Fourth Amendment right to be free from unlawful search and seizure (ECF No 21 ¶ 72). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers

and effects, against unreasonable searches and seizures, shall not be violated...." <u>U.S. Const.</u>

<u>Amend. 4</u>. The Supreme Court has held that

> the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.

<u>Skinner v. Ry. Labor Executives' Ass'n</u>, 489 U.S. 602, 619 (1989). This Court is unaware of any Third Circuit precedent regarding the issue of whether requiring a police officer to submit to an FFD examination violates the subject's Fourth Amendment rights. In <u>Greenawalt v. Indiana Dept. of Corrections</u>, 397 F.3d 587 (7th Cir. 2005), the Seventh Circuit considered a similar issue: whether requiring a Department of Corrections employee to undergo a psychological evaluation in order to keep her job was a search for Fourth Amendment purposes. The court declined to extend Fourth Amendment protections to "the putting of questions to a person, even when the questions are skillfully designed to elicit what most people would regard as highly personal private information," even though Greenawalt's job was at issue. <u>Id</u>. at 590. Simply put, "the Fourth Amendment does not provide a remedy for the unpleasantness of being subjected to a psychological test." <u>Id</u>. at 592. Even if this Court was to agree with Andrekovich that the FFD examination constituted a search, it is clear from the record that the intrusion into Andrekovich's privacy does not outweigh the substantial legitimate government interests at stake in insuring all officers are psychologically fit for duty. Because he has not met the first part of the test outlined in <u>West</u>, this claim must fail.


### 2. Alleged Violations of the Fourteenth Amendment

Andrekovich also alleges that Alexander violated his rights under the Fourteenth Amendment by "depriving him of his property interest in continued employment and his liberty interest in reputation without due process of law" and by disseminating his confidential medical records without consent and permitting the perpetuation of false and defamatory allegations as to [his] mental status" (ECF No 21 ¶¶ 71-73).

"To have a property interest in a job ... a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment. Whether a person has a legitimate entitlement to—and hence a property interest in—his government job is a question answered by state law." Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006). Andrekovich, relying on a repealed portion of the Pennsylvania Borough Code, argues that he has a property interest in his employment and therefore should have been granted the due process considerations outlined in Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 541 (1985). See Dee v. Borough of Dunmore, 549 F.3d 225, 230 (3d Cir. 2008) (applying Loudermill and finding no distinguishable difference between suspension and termination where the statute in effect at the time, but now repealed, explicitly stated that it applied to those "suspended, removed or reduced in rank"); see also 53 P.S. § 46190 (Repealed by 2014, April 18, P.L. 432, No. 37, § 3(2)).

Andrekovich is correct of course that police officers may only be removed for cause.[5] However, the portion of the Pennsylvania Borough Code in effect at the time of his FFD evaluation specifically defines removal of a police officer as, *inter alia*, suspensions without pay. See 8 Pa.C.S. § 1190(a) (emphasis added). Because he was suspended with pay, the procedural due

---

[5] Wilson v. MVM, Inc., 475 F.3d 166, 177 (3d Cir.2007) (internal citation omitted) (recognizing that "employment contracts that contain a 'just cause' provision create a property interest in continued employment").

process protections outlined in <u>Loudermill</u> with respect to employment terminations are inapplicable here. <u>See</u> <u>Schmidt v. Creedon</u>, 639 F.3d 587 n. 15 (3d Cir. 2011). As such, no constitutional violation occurred.

The United States Supreme Court has recognized the existence of an "implied right to privacy inherent in the Constitution." <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965).) "Our jurisprudence takes an encompassing view of information entitled to a protected right to privacy. [T]he right not to have intimate facts concerning one's life disclosed without one's consent ... is a venerable one whose constitutional significance we have recognized...." <u>Sterling v. Borough of Minersville</u>, 232 F.3d 190, 195 (3d Cir. 2000) (collecting cases) (citations and quotation marks omitted). This Court recognizes Andrekovich's well-established right to confidentiality of his personal medical records. However, disclosure of Dr. Goreczny's report to members of Borough Council with a statutorily proscribed right to consider a police officer's mental health status vis-à-vis his continued employment does not automatically amount to an impermissible invasion of privacy. <u>See</u> <u>Whalen v. Roe</u>, 429 U.S. 589 (1977) (holding that "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy."). Similarly, dissemination of the Report during a union grievance proceeding (the validity of which Andrekovich does not dispute) cannot amount to a constitutional violation. According, as above, because there has been no deprivation of his constitutional rights, Andrekovich's claims against Alexander fail.

b.  Claims Against Wittenburg

Andrekovich argues that Wittenburg, as union steward, violated his First Amendment right to freedom of association and obstructed his liberty interests under the Fourteenth Amendment in persuading other officers to endorse the allegations contained in the Gang of Six Letter, and by continually and repeatedly expressing to other officers, Borough employees, Borough Council, and the general public that Andrekovich suffered from a mental impairment (ECF No. 21 ¶¶ 75-78).

1.  Alleged Violation of the First Amendment

While the First Amendment protects the right to participate in union activities, the Third Circuit has held that labor unions, in general, are not state actors. See Wiggins v. String, 428 Fed. Appx. 117, 118 (3d Cir. 2011).  Accordingly, it stands to reason that actions alleged to have been taken by Wittenburg in his capacity as union representative cannot fall under the color of state law. See West, supra.

To the extent that Andrekovich is arguing that Wittenburg acted under color of state law in his capacity as a police officer, the analysis is more nuanced.

> The traditional definition of acting under color of state law requires that the defendant in a [section] 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Accordingly, acts of a state or local employee in her official capacity will generally be found to have occurred under color of state law. This will be so whether the complained of conduct was in furtherance of the state's goals or constituted an abuse of official power. It is firmly established that a defendant in a section 1983 suit acts under color of state law when he abuses the position given to him by the State.
>
> It is [also] clear that under 'color' of law means under 'pretense' of law. Thus, one who is without actual authority, but who purports to act according to official power, may also act under color of state law.

Barna v. City of Perth Amboy, 42 F.3d 809, 815–16 (3d Cir. 1994) (citations and quotation marks omitted). With respect to police officers,

> [t]he inquiry, like any other, must consider the totality of the circumstances in a fact-intensive analysis. See Harvey [v. Plains Twp. Police Dep't, 635 F.3d 606, 610–11 (3d Cir. 2011)]; Parrilla–Burgos [v. Hernández–Rivera, 108 F.3d 445, 499–50 (1st Cir. 1997)] (citing Barna and authority from other circuits and explaining that "[w]hile not explicitly adopting a totality of the circumstances test, these courts have examined the circumstances surrounding a challenged act to determine whether it was committed under color of state law"). The ultimate question is whether the perpetrating officer's conduct is "related in some meaningful way either to the officer's governmental status or to the performance of his duties," Martinez [v. Colon, 54 F.3d 980, 987 (1st Cir. 1995)], or whether the officer's conduct consists of "purely private acts which are not furthered by any actual or purported state authority," Barna, 42 F.3d at 816.

Washington-Pope v. City of Philadelphia, 979 F. Supp. 2d 544, 567 (E.D. Pa. 2013).

In his amended complaint, Andrekovich asserts that Wittenburg violated his First Amendment rights by persuading other members of the union "to support and vote for contract provisions which would have operated solely to the detriment of Andrekovich and the only other officer who had refused to sign [the Gang of Six Letter] and instructed members of the bargaining unit and other officers not to speak to" him (ECF No. 21 ¶76). In his brief in opposition to the motion for summary judgment, Andrekovich asserts that Wittenburg infringed upon this right by refusing to engage with Andrekovich, failing to inform him of union meetings, and asserting to others that there was "an iron-clad dereliction of duty" charge against Andrekovich, which was averse to Wittenburg's position as union steward (ECF No. 43, pg. 30 (unnumbered)). Thereafter, Andrekovich, in the stream-of-consciousness prevalent throughout his brief, claims that his issue is not with the union, which provided alternative representation after Wittenburg refused to speak with him, but "is based on Wittenburg's actions in commencing departmental disciplinary proceedings against [Andrekovich] under the purported authority of Borza … which had the

purpose and effect of isolating [him] from his co-workers and excluding him from discussions of union business, which he only heard second-hand, if at all" (Id.)

Wittenburg's actions, though offensive, are not "fairly attributable to the state." Contrary to Andrekovich's characterization, there is no evidence to suggest that Wittenburg commenced disciplinary proceedings against him. Moreover, there is no indication that Wittenburg engaged in any action, including drafting the Letter, at Borza's behest, nor was he in a position of power over Andrekovich when he made his statements. It is well-settled that "an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir.1995). At best, the well-pled actions complained of in this matter rise to the level of an "alleged workplace nemesis (and vice versa) without any plausible connection to conduct taken under the color of state law." Fouse v. Beaver Cty., 2015 WL 1967242, at *9 (W.D. Pa. May 1, 2015).

2.  Alleged Violation of the Fourteenth Amendment

Andrekovich alleges that Wittenburg's actions in "publically disclosing his beliefs as to [Andrekovich's] mental status and fitness for duty and advocating for [Andrekovich's] suspension and/or termination" violated his rights to property,[6] liberty, and privacy under the Fourteenth Amendment.

"Although there is no protectable constitutional liberty interest in one's reputation alone, a plaintiff can allege a due process violation by showing a "stigma," i.e., reputational harm, in addition to, or "plus," a "deprivation of some additional right or interest." Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006).

---

[6] Andrekovich's alleged right-to-property claim fails for the reasons discussed above.

In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest. Codd v. Velger, 429 U.S. 624, 628 [] (1977). The creation and dissemination of a false and defamatory impression is the "stigma," and the termination is the "plus." When such a deprivation occurs, the employee is entitled to a name-clearing hearing.

Id. at 236.

With respect to this allegation, this Court is mindful that the Third Circuit has, in several cases, held that the deprivation a plaintiff suffered along with stigma to his reputation was not sufficiently weighty to satisfy the "plus" requirement, because the plaintiff in each case did not lose his job, and instead complained about some adverse employment action less drastic than discharge. Dee v. Borough of Dunmore, 549 F.3d 225, 234 (3d Cir. 2008) (citations omitted). Here, Andrekovich suffered no adverse employment action. Accordingly, even assuming, *arguendo* that he proved the stigma prong, his claim fails to satisfy the "plus" requirement.


3.      Section 1983 Liability for the Borough Under Monell

It is well-settled that

a local government may not be sued under § 1983 for any injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under § 1983.

Monell v. Department of Social Servs. of City of N.Y., 436 U.S. 658, 694 (1978) (citations and quotation marks omitted).

In order to sustain a claim under Monell, a plaintiff must first establish "that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir.1990).

"Determining who is an official possessing final authority to establish municipal policy is not a question of fact, but a question of state law." Boyden v. Twp. of Upper Darby, 5 F. Supp. 3d 731, 742 (E.D. Pa. 2014), citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). Additionally, a plaintiff must set forth facts sufficient to establish a custom or policy[7] of the Borough. "Custom … can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz, 915 F.2d at 850. See also McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) ("To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was."). Further, a plaintiff seeking to establish liability pursuant to Monell must establish causation by properly pleading that the municipality's policy or custom "was the source of [his or] her injury." Santiago, 629 F.3d at 135.

In his amended complaint, Andrekovich identifies Alexander as a policy-maker (ECF No. 21 ¶ 80). However, he is less explicit when it comes to identifying a municipal custom, alluding only to the "course of conduct engaged in by Wittenburg and other members of the police department" (Id.) In his brief in opposition to the motion for summary judgment, he expands on the concept of custom by citing to testimony that Alexander would side against Andrekovich and would "throw [him] out of his office when he had issues or complaints" (ECF No. 42, pg. 28 (unnumbered)).

These conclusory allegations, which merely parrot the standard of liability, are insufficient to state a claim for section 1983 liability under Monell. See Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995) (holding that "vague assertions" of a policy or custom, without more,

---

[7] Andrekovich has failed to allege existence of a formally-enacted policy; thus, the Court will confine its analysis to whether the amended complaint pleads sufficiently facts to establish a custom.

are not sufficient to state a claim under <u>Monell</u>).  Moreover, the Third Circuit has held that, "at a minimum, the government must act with deliberate indifference to the purported constitutional deprivation in order to ground liability." <u>Jiminez v. All Am. Rathskeller, Inc</u>., 503 F.3d 247, 250 (3d Cir. 2007) (citing <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 445 (3d Cir.1994)).  The record here does not support any alleged indifference to a purported constitutional violation; rather, the evidence suggests that Alexander investigated and took action on the reports made to him by officers, including those made by and against Andrekovich.  That Andrekovich was not satisfied with the outcome of those investigations or adequacy of the remedy does not give rise to a constitutional violation or municipal liability for the same.

### Conclusion

The Supreme Court in <u>Anderson</u> laid down the axiom of summary judgment practice that, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." 477 U.S. 242, 252 (1986).  Here, as set forth above, there is no genuine dispute as to any material fact; thus, Defendants are entitled to judgment as a matter of law.  <u>See</u> Fed.R.Civ.P. 56(a). Accordingly, this Court will grant Defendants' motion for summary judgment (ECF No. 39).

An appropriate order follows.

DATED this 29th day of October, 2018.

BY THE COURT:


s/ Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIAN ANDREKOVICH, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1041 |
| | ) | |
| BOROUGH OF PUNXSUTAWNEY, | ) | Magistrate Judge Robert C. Mitchell |
| RICHARD ALEXANDER *in his* | ) | |
| *individual capacity*, and FRANK | ) | |
| WITTENBURG *in his individual capacity* | ) | |
| Defendants. | ) | |

<u>ORDER</u>

AND NOW, this 29th day of October, 2018, for the reasons stated in the Opinion filed contemporaneously herewith, it is hereby ORDERED that the Defendants' Motion for Summary Judgment (ECF No. 39) be and the same hereby is GRANTED.

<u>/s/  Robert C. Mitchell</u>
ROBERT C. MITCHELL
United States Magistrate Judge

Cc: record counsel via CM-ECF